IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF SOUTH CAROLINA

ANGELA D. GOSNELL, Plaintiff,

v.

CAROLYN W. COLVIN, COMMISSIONER OF SOCIAL SECURITY ADMINISTRATION, Defendant.

CIVIL ACTION NO. 9:15-4271-TMC-BM

**REPORT AND RECOMMENDATION**

Plaintiff filed the complaint in this action pursuant to 42 U.S.C. § 405(g), seeking judicial review of the final decision of the Commissioner wherein she was denied disability benefits. This case was referred to the undersigned for a report and recommendation pursuant to Local Rule 73.02(B)(2)(a), (D.S.C.).

Plaintiff applied for Supplemental Security Income (SSI)[1] on June 4, 2013 (protective

[1]In order to obtain Social Security Disability Insurance Benefits (DIB), a claimant must show that he or she became disabled prior to the expiration of his or her insured status. See 42 U.S.C. § 423(c); 20 C.F.R. § 404.101 (2009). However, under SSI, the claimant's entitlement to benefits (assuming they establish disability) begins the month following the date of filing the application forward. Pariseau v. Astrue, No. 07-268, 2008 WL 2414851, * 13 (D.R.I. June 13, 2008); see 20 C.F.R. § § 416.202(g), 416.203(b), 416.335 (2009). Therefore, while the definition of disability is the same under both DIB and SSI; Emberlin v. Astrue, No. 06-4136, 2008 WL 565185, at * 1 n. 3 (D.S.D. Feb. 29, 2008); "[a]n applicant who cannot establish that she was disabled during the insured period for DIB may still receive SSI benefits if she can establish that she is disabled and has limited means." Sienkiewicz v. Barnhart, No. 04-1542, 2005 WL 83841, at ** 3 (7th Cir. Jan. 6, 2005). See also Splude v. Apfel, 165 F.3d 85, 87 (1st Cir. 1999)[Discussing the difference between DIB and SSI (continued...)



filing date), alleging disability as of May 16, 2013 due to effects of injuries sustained to her nervous system and an organic mental disorder. (R.pp. 89, 168-177, 192). Plaintiff's claim was denied both initially and upon reconsideration. Plaintiff then requested a hearing before an Administrative Law Judge (ALJ), which was held on December 17, 2014. (R.pp. 50-88). The ALJ thereafter denied Plaintiff's claim in a decision issued March 5, 2015. (R.pp. 20-49). The Appeals Council denied Plaintiff's request for a review of the ALJ's decision, thereby making the determination of the ALJ the final decision of the Commissioner. (R.pp. 1-6).

Plaintiff then filed this action in United States District Court. Plaintiff asserts that there is not substantial evidence to support the ALJ's decision, and that the decision should be reversed and remanded for further proceedings, or for an award of benefits. The Commissioner contends that the decision to deny benefits is supported by substantial evidence, and that Plaintiff was properly found not to be disabled.

**Scope of review**

Under 42 U.S.C. § 405(g), the Court's scope of review is limited to (1) whether the Commissioner's decision is supported by substantial evidence, and (2) whether the ultimate conclusions reached by the Commissioner are legally correct under controlling law. Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990); Richardson v. Califano, 574 F.2d 802, 803 (4th Cir. 1978); Myers v. Califano, 611 F.2d 980, 982-983 (4th Cir. 1980). If the record contains substantial evidence to support the Commissioner's decision, it is the court's duty to affirm the decision. Substantial evidence has been defined as:

---

[1](...continued)
benefits].





> evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. **If there is evidence to justify refusal to direct a verdict were the case before a jury, then there is "substantial evidence."** [emphasis added].

Hays, 907 F.2d at 1456 (citing Laws v. Celebrezze, 368 F.2d 640 (4th Cir. 1966)); see also, Hepp v. Astrue, 511 F.3d 798, 806 (8th cir. 2008)[Noting that the substantial evidence standard is "less demanding than the preponderance of the evidence standard"].

The Court lacks the authority to substitute its own judgment for that of the Commissioner. Laws, 368 F.2d at 642. "[T]he language of [405(g)] precludes a de novo judicial proceeding and requires that the court uphold the [Commissioner's] decision even should the court disagree with such decision as long as it is supported by substantial evidence." Blalock v. Richardson, 483 F.2d 773, 775 (4th Cir. 1972).

## Discussion

A review of the record shows that Plaintiff, who was thirty-nine (39) years old on the date that she alleges she became disabled, has a limited education[2] and past relevant work experience as a mechanic's helper, garment inspector, and folder.[3] (R.p. 43). In order to be considered "disabled" within the meaning of the Social Security Act, Plaintiff must show that she has an impairment or combination of impairments which prevent her from engaging in all substantial gainful activity for which she is qualified by her age, education, experience and functional capacity,

---

[2]Plaintiff testified that she stopped going to school around the eleventh grade, but did not know why she had quit. (R.p. 55).

[3]Although the ALJ listed these jobs as Plaintiff's past relevant work, he noted that Plaintiff had never reported any income or filed taxes, while in her disability report, Plaintiff stated that she had "never worked". (R.pp. 43, 192).





and which has lasted or could reasonably be expected to last for at least twelve (12) consecutive months. After a review of the evidence and testimony in this case, the ALJ determined that, although Plaintiff does suffer from the "severe" impairments[4] of traumatic brain injury (TBI) with left sided hemiparesis, associated cognitive disorder, and substance abuse, rendering her unable to perform any of her purported past relevant work, she nevertheless retained the residual functional capacity (RFC) to perform a restricted range of light work[5] with these conditions, and was therefore not entitled to SSI. (R.pp. 25, 30, 43).

Plaintiff asserts that in reaching this decision, the ALJ erred by improperly determining Plaintiff's RFC, including by failing to perform the necessary function-by-function assessment for determining RFC, and by improperly evaluating and rejecting the opinion of Plaintiff's treating physician, Dr. Aimee Robbins Cantillion. However, after a careful review and consideration of the evidence and arguments presented, the undersigned finds and concludes for the reasons set forth hereinbelow that there is substantial evidence to support the decision of the Commissioner, and that the decision should therefore be affirmed. Laws, 368 F.2d 640 [Substantial evidence is "evidence which a reasoning mind would accept as sufficient to support a particular conclusion"].

---

[4]An impairment is "severe" if it significantly limits a claimant's physical or mental ability to do basic work activities. See 20 C.F.R. § 404.1521(a); Bowen v. Yuckert, 482 U.S. 137, 140-142 (1987).

[5]"Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls." 20 C.F.R. § 404.1567(b) (2005).





**Medical Record**

Plaintiff has a history of drug and substance abuse. (R.p. 728). On May 16, 2013 Plaintiff was injured after jumping out of or being pushed from a moving vehicle while having an argument with another occupant. It was noted that she was "combative at the scene". (R.p. 544). Plaintiff suffered facial fractures and a traumatic brain injury (fracture of the anterior, medial and lateral wall of the left maxillary sinus; non-displaced fracture, deviation of the nasal septum towards the right; and intra cranial hemorrhage following the injury, minimal subarachnoid hemorrhage in the upper right mid brain approximately 1 cm. with post traumatic edema of the right thalamus) as a result of this event. (R.p. 319). During the course of her hospital stay Plaintiff was found to be hemiparetic in both her left upper and lower extremity, and she was discharged to the Roger Peace Rehabilitation Hospital for neurologic rehabilitation. (R.pp. 319-320, 544-545).

Plaintiff was seen back at the Greenville Health Center (where she had been initially seen) on June 6, 2013 by Dr. Cantillion, who summarized her rehabilitation course by noting that, from a medical standpoint, she had done well. (R.p. 538). Plaintiff's vital signs were noted to have been stable throughout her hospitalization, and she had no acute medical issue. Although she continued to have left upper extremity paresis, she was beginning to use this extremity more functionally with activities of daily living, and was also increasing her ambulation. She still had significant short term memory deficits at that time, although her though processing had improved and her long term memory was good. Dr. Cantillion discharged the Plaintiff on July 2, 2013 with a referral to the outpatient brain injury program for ongoing physical therapy, occupational therapy, speech therapy, neuropsychology, and possibly vocational rehabilitation in the future. (R.p. 538).





On July 15, 2013, psychologist Dr. David Klein performed a psychological consult of the Plaintiff. Dr. Klein found on examination that Plaintiff was alert and oriented to person, place, and time, and that her speech was normal. Plaintiff was noted to be a "poor historian", and Dr. Klein opined that she had poor insight and judgment. (R.p. 729). The following month, Dr. Klein provided a "To Whom it May Concern" letter to the Spartanburg County Court (Plaintiff was apparently facing some type of criminal charge) stating that as a result of her accident she suffered a traumatic brain injury and was scheduled to be in therapy for approximately three months. Dr. Klein opined in this "To Whom it May Concern" letter that Plaintiff's injuries severely affected her cognitive skills, and that she would therefore "have difficulty understanding the court process and assisting with her defense". Further, her significant "neuro behavioral impairments including impulsiveness, disinhibition, irritability, and poor social judgment . . . would put her at risk of being harmed in a jail setting". (R.p. 805).

On September 17, 2013, Dr. Cantillion co-signed an outpatient brain injury treatment plan which noted that, among Plaintiff's "strength and assets", were functional bilateral upper and lower extremity strength, coordination and range of motion, basic communication skills, reading comprehension, and auditory comprehension/verbal expression. Her "deficits" included extremity strength, and coordination and range of motion on her left side which affected her gait quality/standing balance. Plaintiff also had some social problems, although Dr. Cantillion assessed her with "Basic/Functional level cognitive/thinking skills (attention, memory, reasoning, organization, judgment, problem solving)". Listed among her functional limitations were problems with her basic mobility and activities of daily living (ADLs), communication/intelligibility, safety





awareness, independent living, community integration and coping skills. Goals for the treatment plan were for Plaintiff to become more independent and eventually return to work, with an estimated time for achieving these "initial goals" being ten to twelve weeks, following which "additional goals may be established". (R.pp. 691-692).

On September 24, 2013 Dr. Klein completed a report in which he concluded that Plaintiff was suffering from severe impairments in attention, memory, spadial orientation, and mental flexibility; that she had a moderate impairment in novel problem solving; but that she was relatively strong in language functions and organized verbal memory. He believed that Plaintiff would benefit from eliminating distractions, keeping directions simple and specific, shortened sessions, frequent breaks, and repetition. She was to continue with her therapy program, with a substance abuse program possibly also being considered. (R.p. 733).

A follow-up treatment review dated December 25, 2013 (reviewed and signed by Dr. Cantillion on January 6, 2014) stated that Plaintiff was "making slow, but steady progress" in her occupational therapy, with her left arm "showing significant improvement". Psychologically, Plaintiff was more active and had been participating in the community more often. It was noted that Plaintiff had been "upset lately" because she had not been able to see her "friend" and her children because this friend was someone she had used drugs with and was involved in her brain injury, but she was encouraged to consider her safety and well being by not associating with this individual. However, notwithstanding this recommendation, the report states that Plaintiff was "convinced they can spend time together and not revert to their old ways of behaving". (R.pp. 735-736). An outpatient visit note signed by Dr. Cantillion on January 16, 2014, while hand written and hard to





decipher, states that Plaintiff was being encouraged to have a daily routine and to get out of the house, although she was not to drive. Plaintiff's goal for the next week was to meet a new friend and begin to socialize. Plaintiff was also encouraged to undergo a home exercise program. On examination Plaintiff was noted to be well developed and well nourished (although overweight), her extremities displayed no cyanosis, and psychiatrically she was oriented X 3, although she had an anxious mood. (R.pp. 840-841).

On April 1, 2014 clinical psychologist Dr. James Ruffing performed a psychological examination on the Plaintiff. On testing Plaintiff was found to have a verbal comprehension index of 70, perceptual reasoning index of 81, a working memory index of 89, a procession speed index of 56, and a full scale IQ of 70. Plaintiff advised Dr. Ruffing that, although she used to get depressed, she no longer did; that she could care for her personal needs including toileting, bathing and feeding; that she was able to eat out and could go shopping; had friends (although they "do nothing together"); she could prepare light meals and do her own laundry; and could utilize telephones and computers. Plaintiff completed the intake questionnaire herself and was able to do so fully and accurately, she was adequately groomed, and was "very polite and good natured". Although Dr. Ruffing noted that she had "somewhat of an awkward gait", her emotional functioning was "unremarkable", she demonstrated an appropriate affect of normal range and intensity and what seemed to be an euthymic mood, denied any history of mental health treatment other than medication, she was fully oriented, her thought processes and thought content were unremarkable, she did not show distractablity to attention, and she demonstrated normal cognitive processing speed. Plaintiff did show a particular weakness on verbal concept formation, verbal reasoning and





knowledge acquired from her environment, as well as a relative weakness in her ability to quickly and correctly scan, sequence, or discriminate simple visual formation. Testing indicated she had a slight reading ability and could likely read texts such as newspaper articles, instruction manuals, or inventory lists, and that she had sufficient math skills such that she could likely manage her finances in her own best interest. Dr. Ruffing assessed Plaintiff with a cognitive disorder not otherwise specified, and opined that she would likely struggle to maintain concentration, persistence and pace. (R.pp. 824-827).

Plaintiff underwent a physical examination by Dr. Lary Korn on April 3, 2014. Plaintiff advised Dr. Korn that she had significant limitations with her left arm in particular, and that she had very poor balance and some "gait issues", although she could weight bear for about thirty to sixty minutes before her left leg was exhausted. She also advised Dr. Korn that she had some issues with short term recall, but felt like she did well with her focus and felt ok with reading and reading comprehension as well as with numbers and math. Dr. Korn assessed Plaintiff's mental status as "fairly normal", although with an "immature affect". Physical examination found Plaintiff's station to be fairly unremarkable, and although her gait was ataxic with some dyssynergic qualities to movement of her left leg, particularly at the hip, she was not using any type of assistive device to ambulate. Her left shoulder was notable for abduction to only ninety degrees, flexion being about the same, and she really had no useful external rotation of the left shoulder. Left shoulder strength was two to three/five within her motion limitations, while her right upper extremity was unremarkable. Her lower extremities had a normal joint appearance in motion with no significant decrepitus. Although her fine dexterity was "very poor" with the left hand, Plaintiff did not have a





tremor. Dr. Korn opined that Plaintiff could not do rapid alternating forearm pronation or supination on the left side, and evaluation generally on her left side was deficient. However, her right side was essentially normal. Maximum grip strength on the right was seventy pounds while on the left was only twenty-eight pounds. Similarly, Plaintiff's pinch strength was only eight pounds on the left compared to twenty-five pounds on the right. There was also some muscle atrophy on the left. Dr. Korn opined that Plaintiff "really could not do much with the left arm at all", but her right arm was her dominate arm. He noted that Plaintiff indicated she could be up about thirty to sixty minutes at a time, although she was "probably going to need to take breaks and get off of her feet periodically through the day much as she had described". (R.pp. 829-832).

On April 8, 2014 state agency physician Dr. Michael Hammonds completed a psychiatric review form for the Plaintiff. After a review of the medical record and evidence he concluded that Plaintiff had no more than a mild restriction in her activities of daily moving, with moderate difficulties in maintaining social functioning and with respect to concentration, persistence or pace. She had had one or two episodes of decompensation. (R.pp. 105-108). He concluded that Plaintiff was not significantly limited in most areas of physiological functioning, with moderate limitations in only a few areas, in particular in the ability to carry out detailed instructions or maintain attention and concentration for extended periods, and with respect to her ability to interact appropriately with the general public. He concluded that Plaintiff would be able to maintain attention and concentration for two hours at a time as required to perform simple tasks, sufficiently to complete an eight hour day and an forty hour work week, and that Plaintiff could work in an environment requiring the completion of only simple, repetitive tasks. (R.pp. 112-114).



Plaintiff also had a Physical Residual Functional Capacity Assessment completed by state agency physician Dr. Stephen Burge on April 10, 2014. Dr. Burge concluded that Plaintiff had the lift and/or carry ability for light work,[6] and was able to stand and/or walk (with normal breaks) for a total of two hours in an eight hour work day, and sit (with normal breaks) for a total of about six hours in an eight hour work day. He opined that Plaintiff was limited in her ability to push and/or pull in her left upper and lower extremities; that she could occasionally climb ramps/stairs, balance, kneel, and crawl; frequently stoop and crouch, but never climb ladders/ropes/scaffolds. Plaintiff was limited in her manipulative abilities on the left, but had no environmental limitations although she should avoid all exposure to hazards such as machinery and heights. (R.pp. 109-111).

When Plaintiff was seen for follow-up by Dr. Cantillion on May 13, 2014, she complained about her request for disability having been turned down. She had also changed residences. Plaintiff either complained, or Dr. Cantillion found (it is unclear which), that she had an intermittent tremor in her left hand. Psychiatrically she was oriented X 3 and she had an appropriate mood/affect. Dr. Cantillion wrote something under the "Extremities" section of the report, apparently relating to grip strength and something to do with her fingers, but it is hard to read. (R.p. 838). When Plaintiff returned to see Dr. Cantillion on July 22, 2014, Plaintiff complained of being anxious. She had also fallen after her knee had buckled and "scrapped up" her left knee.

---

[6]Even though Dr. Burge concluded that Plaintiff had the *lifting* capacity for light work, he stated that Plaintiff had the overall physical RFC for only sedentary work (which has a lifting capacity of no more than 10 pounds at a time), taking into account all seven strength factors (not just lifting/carrying, but also standing, walking, sitting, pushing, and pulling). A sedentary job is defined as one which involves sitting, although a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met. 20 C.F.R. § 404.1567(a) (2005). Even assuming this overall assessment, however, Dr. Burge still did not believe Plaintiff was disabled. (R.p. 114).





Plaintiff indicated that her pain improved with Neurotin. Psychiatrically, Plaintiff was again oriented X 3. The assessment portion of this medical note indicates that Plaintiff was "working on getting disability". (R.pp. 836-837).

On November 10, 2014, Dr. Cantillion completed a fill in sheet in which she indicated that Plaintiff was not capable of full time work due to cognitive/memory deficits. She further stated that this had been Plaintiff's condition since her accident on May 16, 2013. Dr. Cantillion also indicated that the effects Plaintiff suffered from as a result of the combination of her impairments would most likely interfere with normal pace for an eight hour a day/five day a week job and create interruptions of work in unpredictable periods of rest/breaks. However, when asked to summarize the findings or test results that supported these restrictions, Dr. Cantillion left that portion of the sheet blank. (R.p. 853).

Eight days later, on November 18, 2014, Dr. Cantillion completed another questionnaire in which she stated that Plaintiff had been diagnosed with severe traumatic brain injury with spastic left hemiplegia. She opined that Plaintiff suffered from left shoulder and arm pain and general left spasticity which also resulted in gait instability, that she had memory deficits, that Plaintiff would need to lie down one to two hours a day due to easy fatigability and pain, and that working on a regular and continuous basis would cause Plaintiff's condition to deteriorate because she "cannot mentally or functionally manage a job". Even so, Dr. Cantillion further opined that Plaintiff could sit continuously up to four hours in an eight hour work day, for a total of six hours; stand continuously for thirty minutes in an eight hour work day for a total of two hours; that she could walk continuously for a thousand feet and for a total of one hour in an eight hour work day;





that she could occasionally lift and carry up to ten pounds but never more than that; that she could occasionally bend and reach but never squat and climb; that she had no restrictions with respect to her right hand but could not perform work activities with her left hand; that Plaintiff could use her right leg and foot for repetitive movements but could not use her left leg and foot for this purpose; and that she could not drive a vehicle or work around unprotected heights. She did believe Plaintiff would be able to travel on a daily basis by bus. Dr. Cantillion also noted in this report that Plaintiff was no longer under her care. (R.pp. 848-852).

**ALJ's Findings**

After review of this evidence in conjunction with the subjective testimony from the hearing, the ALJ determined that Plaintiff's mental impairment caused a mild restriction in her activities of daily living, moderate difficulties in social functioning, and moderate difficulties with respect to concentration, persistence or pace. (R.pp. 28-29). He further concluded that the combination of Plaintiff's physical and mental impairments would restrict her to the performance of light work with no more than two hours combined of standing and walking, sitting for six hours; that she could walk for thirty minutes at a time and stand for fifteen minutes at a time; that she should never climb ladders, ropes, or scaffolds, but could occasionally climb ramps and stairs, balance, kneel, crouch and crawl; that she could frequently stoop; that use of her left non-dominate hand and arm were limited to "helper status", but that she had no restriction in the use of her right extremity; that she should have less than occasional, if any, exposure to hazards associated with unprotected dangerous machinery or unprotected heights; that she is able to understand, remember, and carry out simple, routine tasks in a low stress work environment (defined as one being free of





fast-paced or team-dependant production requirements) and involving the application of common sense understanding to carry out detailed , but uninvolved, written or oral instructions with few concrete variables from standardized situation; that she should have less than occasional interaction with the general public and only occasional interaction with co-workers; and that she should not be openly exposed to accessible alcoholic substances, or openly exposed to any controlled substances or prescription medications. (R.p. 30). Then, after obtaining testimony from a VE, the ALJ concluded that there were jobs that existed in the national economy that Plaintiff could perform with these limitations. (R.pp. 43-44).

The medical records and opinions discussed hereinabove contain substantial evidence to support the ALJ's findings and conclusions in this case. Laws, 368 F.2d at 642 [Substantial evidence is "evidence which a reasoning mind would accept as sufficient to support a particular conclusion"]; Guthrie v. Astrue, No. 10-858, 2011 WL 7583572, at * 3 (S.D.Ohio Nov. 15, 2011), adopted by, 2012 WL 9991555 (S.D.Ohio Mar. 22, 2012)[Even where substantial evidence may exist to support a contrary conclusion, "[s]o long as substantial evidence exists to support the Commissioner's decision . . . this Court must affirm."]; see generally, Trenary v. Bowen, 898 F.2d 1361, 1364 (8th Cir. 1990) [Courts should properly focus not on a claimant's diagnosis, but on the claimant's actual functional limitations]; see also Smith v. Chater, 99 F.3d 635, 638 (4th Cir. 1996) ["The duty to resolve conflicts in the evidence rests with the ALJ, not with a reviewing court"].

**Residual Functional Capacity**

Plaintiff's first claim of error is that the ALJ failed to properly determine Plaintiff's RFC by failing to perform the necessary function-by-function assessment and by failing to





adequately explain how he arrived at his conclusions.[7] RFC is defined as "the most [a claimant] can still do despite [the claimant's] limitations." 20 C.F.R. § 404.1545(a)(1). In SSR 96-8p, RFC is defined as a function-by-function assessment of an individual's physical and mental capacities to do sustained, work-related physical and mental activities in a work setting on a regular and continuing basis of eight hours per day, five days per week, or the equivalent. SSR 96-8p, 1996 WL 374184. An RFC "assessment must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g., laboratory findings) and nonmedical evidence (e.g., daily activities, observations);" Id. at *7; and "[r]emand may be appropriate ... where an ALJ fails to assess a claimant's capacity to perform relevant functions, despite contradictory evidence in the record, or where other inadequacies in the ALJ's analysis frustrate meaningful review." Mascio v. Colvin, 780 F.3d 632, 636 (4th Cir. 2015), citing Cichocki v. Astrue, 729 F.3d 172, 177 (2d Cir. 2013).

Here, there is no error evident in the decision, as the ALJ included a narrative discussion of the medical and non-medical evidence in concluding that Plaintiff had the RFC to perform the limited range of light work set forth in the decision. Knox v. Astrue, 327 Fed.Appx. 652, 657 (7th Cir. 2009)["[T]he expression of a claimant's RFC need not be articulated function-by-function; a narrative discussion of a claimant's symptoms and medical source opinions is

[7]Plaintiff's discussion in her brief with respect to a function-by-function assessment contains scrivener's errors, as the text appears to have been lifted from another brief discussing a Plaintiff named "Hall" and whether Hall could perform the full range of medium work. See Plaintiff's Brief, pp. 23-24. Even so, it is clear that Plaintiff is arguing that the ALJ never indicated in his decision *in this case* the amount of weight that Plaintiff could lift and carry. Id., p. 23. As such, that issue has been discussed hereinabove. Further, in her reply brief Plaintiff waived her argument made in her initial brief with respect to application of the Grids in this case, although Plaintiff continues to argue that she is limited to no more than a sedentary work capacity.





sufficient"], citing Bayliss v. Barnhart, 427 F.3d 1211, 1217 (9th Cir. 2005). Notably, this review and discussion is set forth in considerable detail, covering over eighteen single spaced typed pages. See generally, R.pp. 25-43. Plaintiff's complaint in her brief that, in determining her RFC, the ALJ "never indicated [the] amount of weight that [Plaintiff] could lift and carry" (Plaintiff's Brief, p. 23) is somewhat puzzling, since the ALJ specifically found that Plaintiff could perform light work as defined in 20 C.F.R. 416.967(b), which provides for a lifting capacity of no more than twenty pounds at a time with frequent lifting or carrying of objects weighing up to ten pounds. (R.p. 30). Cf. Whalen v. Colvin, No. 14-1290, 2016 WL 1168485 at * 8 n. 4 (D.Colo. Mar. 23, 2016) [Noting that although Plaintiff complained that the ALJ did not specifically state how much Plaintiff could lift, lifting capacity was contained in restriction to light work]. Plaintiff's complaint that the ALJ otherwise failed to adequately explain how he arrived at the RFC set forth in the decision is equally without merit, as is discussed below.

With respect to Plaintiff's physical RFC, the ALJ cited to evidence to support his findings that Plaintiff can stand and walk combined for two hours, and can sit for six hours, in an eight hour work day; that she can walk for thirty minutes at one time and stand for fifteen minutes at one time; that while her left non-dominate hand and arm are limited to helper status she has no restriction in her right upper extremity; and that she can frequently stoop; occasionally climb ramps and stairs, balance, kneel, crouch, and crawl; but never climb ladders, ropes, or scaffolds. (R.p. 30). Specifically, the ALJ noted the medical records showing that, while Plaintiff suffered from left upper extremity paresis, she had no limitation in her right upper extremity and could even use her left upper extremity functionally with activities of daily living. (R.pp. 32, 34-36). The ALJ also specifically





cited to the medical records showing that Plaintiff had the ability to stand and walk combined for at least two hours with the ability to sit for at least six hours in an eight hour work day, as well as walk for thirty minutes at one time and stand for up to fifteen minutes at one time, together with the other postural limitations set forth in the RFC. (R.pp. 34-37, 41-42).

These medical records and case manager reports provide substantial evidence to support the physical RFC set forth in the decision. See generally, (R.pp. 101-111 [Noting in April 2014 that Plaintiff had the lift and/or carry ability for light work; that Plaintiff was able to stand and/or walk (with normal breaks) for a total of two hours in an eight hour work day, and sit (with normal breaks) for a total of about six hours in an eight hour work day with postural limitations consistent with the RFC in the decision]; 538 [Noting that shortly after Plaintiff's accident she continued to have left upper extremity paresis, but was beginning to use this extremity more functionally with activities of daily living, and was also increasing her ambulation]; 691-692 [Noting that by September 2013 Plaintiff's strength and assets including functional bilateral upper and lower extremity strength, but was limited in her strength and coordination along with range of motion on the left side]; 824-827 [Noting that Plaintiff could care for her personal needs, had the ability to prepare light meals and do her own laundry, and was able to eat out and could go shopping]; 829-832 [Noting in April 2014 that although Plaintiff had very poor balance and some gait issues, she could weight bear for about thirty to sixty minutes before her left leg was exhausted, that her station was fairly unremarkable, that she did not need to use any type of assistive device to ambulate, that her lower extremities had a normal joint appearance and motion with no significant decrepitous, and that although Plaintiff continued to have limitations in her left side, her right side was essentially





normal]; 840-841 [Noting in January 2014 that Plaintiff was well developed, well nourished, that her extremities displayed no cyanosis, with Plaintiff being encouraged to participate in a home exercise program]; 848-852 [Noting in November 2014 that Plaintiff could sit continuously for up to four hours in an eight hour work day, for a total of six hours; stand continuously for thirty minutes in an eight hour work day for a total of two hours; that she could walk continuously for a thousand feet and for a total of one hour in an eight hour work day; and that Plaintiff had no restrictions with respect to her right hand but could not perform work activities with her left hand].

The ALJ's analysis of and citation to this evidence is sufficient to support his conclusions, and Plaintiff's argument that the ALJ failed to properly evaluate her RFC in making these findings is therefore without merit. Osgar v. Barnhart, No. 02-2552, 2004 WL 3751471 at *5 (D.S.C. Mar. 29, 2004), Knox, 327 Fed.Appx. at 657 ["[T]he expression of a claimant's RFC need not be articulated function-by-function; a narrative discussion of a claimant's symptoms and medical source opinions is sufficient"]. While Plaintiff argues that there are records from which a conclusion could be drawn that Plaintiff's physical impairments would limit her to no more than a sedentary work level, it is the job of the ALJ to weigh and assess contradictory evidence in making a decision on the claim presented, and as long as there is substantial evidence to support the ALJ's findings, this Court must affirm. Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990) [It is the responsibility of the ALJ to weigh the evidence and resolve conflicts in that evidence]; Laws, 368 F.2d 640 [Substantial evidence is "evidence which a reasoning mind would accept as sufficient to support a particular conclusion"]; Kellough v. Heckler, 785 F.2d 1147, 1149 (4th Cir. 1986) ["If the Secretary's dispositive factual findings are supported by substantial evidence, they must be affirmed,





even in cases where contrary findings of an ALJ might also be so supported."] (citation omitted)]; Smith, 99 F.3d at 638 ["The duty to resolve conflicts in the evidence rests with the ALJ, not with a reviewing court"].

With respect to Plaintiff's mental RFC, the ALJ again cites to substantial evidence in the case record to support Plaintiff's functional findings and limitations to simple low stress work and related restrictions. (R.pp. 28-30). With respect to the finding that Plaintiff had a mild restriction in her activities of daily living, the ALJ noted Plaintiff's ability to make simple cold and hot meals, that she assisted with home management tasks such as laundry and cleaning and could handle her own money, and that she could handle her own personal needs, utilize a computer, was able to go shopping and eat out in restaurants, and maintain her personal grooming. (R.pp. 28, 824-827, 840-841). As for the ALJ's finding that Plaintiff had moderate difficulties in social functioning and with regard to concentration, persistence or pace, the ALJ noted Dr. Klein's finding that Plaintiff's social judgment was in the average range and that she had been more active and been participating in the community more often, Dr. Ruffing's finding that Plaintiff's emotional function was unremarkable although she had some disturbance noted with respect to expressive speech, but was in any event very polite and good natured, that Plaintiff was able to complete an Intake Questionnaire herself fully and accurately, as well as Dr. Ruffing's observation that Plaintiff did not show distractablity to attention and demonstrated normal cognitive processing speed, although she would likely struggle to manage concentration, persistence and pace. (R.pp. 28-29, 33-35, 38, 824-827, 829-832).





Consistent with these records, in his RFC finding the ALJ restricted Plaintiff to less than occasional interaction with the general public and only occasional interaction with co-workers; less than occasional, if any, exposure to hazards associated with unprotected dangerous machinery or unprotected heights; and to simple, routine tasks in a low stress work environment (defined as one being free of fast-paced or team-dependant production requirements) and involving the application of common sense understanding to carry out detailed, but uninvolved, written or oral instructions with few concrete variables in or from standardized situations, all limitations which accommodate the functional findings noted and discussed in the records cited hereinabove. (R.p. 30). The ALJ further noted Plaintiff's history of polysubstance abuse including methamphetamine, heroin, cocaine, marijuana, benzodiazepines, and alcohol, and therefore limited her to jobs where she would not be openly exposed to accessible alcoholic substances, controlled substances, or prescription medications. (R.pp. 30, 32). In addition, the ALJ also gave great weight to Dr. Hammond's psychological opinion, which was consistent with the ALJ's findings and which was specifically adopted into the RFC findings. (R.pp. 42, 105-108, 112-114). Smith v. Schweiker, 795 F.2d 343, 345 (4th Cir. 1986) [Opinion of non-examining physicians can constitute substantial evidence to support the decision of the Commissioner].

Again, the undersigned can find no reversible in the ALJ's RFC findings in light of the record in this case. Lyall v. Chater, No. 94-2395, 1995 WL 417654 at * 1 (4th Cir. 1995)[Finding no error where the ALJ's analysis "was sufficiently comprehensive as to permit appellate review"]; Stephens v. Heckler, 766 F.2d 284, 287 (7th Cir. 1985) [ALJ's discussion of evidence need only be sufficient to "assure [the court] that [he] considered the important evidence





. . . [and to enable the court] to trace the path of [his] reasoning"]. Plaintiff simply disagrees with the conclusions reached by the ALJ; however, even assuming for purposes of further discussion that a different conclusion *could have* been reached based on the evidence presented, that is not a basis on which to overturn the decision. Kellough, 785 F.2d at 1149 ["If the Secretary's dispositive factual findings are supported by substantial evidence, they must be affirmed, even in cases where contrary findings of an ALJ might also be so supported."] (citation omitted)]; Guthrie v. Astrue, No. 10-858, 2011 WL 7583572, at * 3 (S.D. Ohio Nov. 15, 2011)[Even where substantial evidence may exist to support a contrary conclusion, "[s]o long as substantial evidence exists to support the Commissioner's decision . . . this Court must affirm."], adopted by, 2012 WL 9991555 (S.D.Ohio Mar. 22, 2012); Poling v. Halter, No. 00-40, 2001 WL 34630642, at * 7 (N.D.W.Va. Mar. 29, 2001)["It is the duty of the ALJ, rather than the reviewing court, to assess the evidence of record and draw inferences therefrom"].

Finally, the record shows that the ALJ obtained testimony from a vocational expert at the hearing, and in response to a hypothetical that set forth the RFC found in the decision, the VE identified several jobs that Plaintiff could perform with these limitations. (R.pp. 81-86). The ALJ accepted this analysis (R.pp. 43-44), and the undersigned can find no reversible error in his having done so. See Wilson v. Califano, 617 F.2d 1050, 1053 (4th Cir. 1980)[ALJ may rely on VE opinion based on training, experience and familiarity with skills necessary to function in various jobs]; cf. Ray v. Colvin, No. 12-3307, 2014 WL 1093075, at * 11 (D.S.C. March 17, 2014).

Therefore, Plaintiff's argument that the ALJ committed reversible error in his evaluation of her RFC, or that the RFC finding is not supported by substantial evidence in the case





record, is without merit.

**Treating Physician's Opinion**

Plaintiff also argues that the opinion of Dr. Cantillion, her treating physician, relating to her medical condition includes work-preclusive limitations which the ALJ improperly rejected in determining her RFC, therefore warranting a reversal of the decision. Plaintiff is correct that, ordinarily, treating physician's opinions are accorded great weight. See Craig v. Chater, 76 F.3d at 590 (4th Cir. 1996)[noting importance of treating physician opinions]. Here, however, the ALJ gave only limited weight to Dr. Cantillion's opinions, finding that the extent of limitation opined to by Dr. Cantillion in her November 2014 questionnaire responses were not supported by her own treatment notes, and were also contradicted by persuasive evidence in the case record. (R.p. 40). The undersigned can find no reversible error in the ALJ's conclusions. Craig, 76 F.3d at 89-590 (4th Cir. 1996)[rejection of treating physician's opinion of disability justified where the treating physician's opinion was inconsistent with substantial evidence of record]; Krogmeier v. Barnhart, 294 F.3d 1019, 1023 (8th Cir. 2002) ["[W]hen a treating physician's opinions are inconsistent or contrary to the medical evidence as a whole, they are entitled to less weight" (citations omitted) ]; see also Burch v. Apfel, 9 F. App'x 255 (4th Cir. 2001)[ALJ did not err in giving physician's opinion little weight where the physician's opinion was not consistent with her own progress notes.].

In assigning Dr. Cantillion's opinion limited weight, the ALJ noted that she only saw the Plaintiff on a relatively infrequent basis, that she had failed in her November 10, 2014 opinion to set forth any findings or test results to support the restrictions listed, nor was there any credible evidence that Plaintiff experienced related pain with respect to her left hemiparesis. (R.p. 40). A





review of Dr. Cantillion's records confirm that although she opined in November 2014 that Plaintiff's pain and combination of impairments would most likely interfere with Plaintiff's ability to work at a normal pace in an eight hour a day/five day a week job, that as part of an outpatient brain injury treatment report in September 2013, Dr. Cantillion listed among Plaintiff's strengths and assets that she had functional bilatteral upper and lower extremity strength, coordination and range of motion, basic communication skills, reading comprehension, and auditory comprehension/verbal expression. While Dr. Cantillion also listed extremity strength, gait and standing issues, and left side coordination and weakness among Plaintiff's "deficits" in that report, these deficits were specifically accommodated for by the ALJ in Plaintiff's RFC with standing and walking limitations along with related postural limitations, as well as by a limitation of Plaintiff's left non-dominate hand and arm to "helper" status. Notably, Dr. Cantillion even opined in December 2013 that Plaintiff's occupational therapy had resulted in "significant improvement" of Plaintiff's use of her left arm, while in an office note from January 2014, Dr. Cantillion noted on examination that Plaintiff was well developed, that her extremities displayed no cyonosis, and that Plaintiff should undertake a home exercise program, all findings inconsistent with the extent of limitation opined to by Dr. Cantillion in her questionnaire responses from November 2014.

Further, although in May 2014 Dr. Cantillion's office notes reflect that Plaintiff had an intermittent tremor in her left hand along with some problems apparently relating to grip strength, as noted, the ALJ specifically limited Plaintiff's left non-dominate hand and arm to only helper status. Additionally, even Dr. Cantillion, in her questionnaire responses of November 18, 2014, opined that Plaintiff could sit continuously for up to four hours in an eight hour work day, for a total





of six hours; stand continuously for thirty minutes in an eight hour work day for a total of two hours; that she could walk continuously for a thousand feet and for a total of one hour in an eight hour work day; and could not perform work activities with her left hand but had no restrictions with respect to her right hand, all findings consistent with the RFC assigned by the ALJ in the decision. Similarly, although Dr. Cantillion's questionnaire responses from November 2014 state that Plaintiff would not be able to work on a regular and continuous basis because she could not "mentally or functionally" manage a job and could not maintain a normal pace for an eight hour day/five day a week job, in September 2013 Dr. Cantillion had opined that Plaintiff had a "Basic/Functional level of cognitive/thinking skills (attention, memory, reasoning, organization, judgment, problem solving)", in January 2014 she had encouraged Plaintiff to establish a daily routine, get out of the house, and begin to socialize, and in May 2014 she noted that psychiatrically Plaintiff was oriented X 3 and had an appropriate mood/affect.

These records provide substantial support for the ALJ's decision to give limited weight to Dr. Cantillion's November 2014 opinion that Plaintiff cannot "mentally or functionally manage a job", and for his finding that the extent of limitation opined to by Dr. Cantillion in November 2014 was not supported by her own treatment notes. Burch, 9 F. App'x 255 [ALJ did not err in giving physician's opinion little weight where the physician's opinion was not consistent with her own progress notes.]; see Castellano v. Secretary of Health & Human Servs., 26 F.3d 1027, 1029 (10th Cir. 1994) [physician opinion that a claimant is totally disabled "is not dispositive because final responsibility for determining the ultimate issue of disability is reserved to the [Commissioner]"]; see also Hays, 907 F.2d at 1456 [It is the responsibility of the ALJ to weigh the





evidence and resolve conflicts in that evidence]; Thomas v. Celebreeze, 331 F.2d 541, 543 (4th Cir. 1964) [court scrutinizes the record as a whole to determine whether the conclusions reached are rational].

Additionally, and as further support for his RFC finding, the ALJ also cited to "persuasive contradictory evidence". (R.p. 40). Craig, 76 F.3d at 89-590 (4th Cir. 1996)[rejection of treating physician's opinion of disability justified where the treating physician's opinion was inconsistent with substantial evidence of record]. First, the ALJ gave partial weight to Dr. Korn's examination findings from April 2014 (the exception being Dr. Korn's finding that Plaintiff was essentially functioning as a one armed individual, which the ALJ found to be inconsistent with Dr. Korn's finding that Plaintiff could grip 28 pounds on the left and pinch 8 pounds, as well as being at odds with the extent of Plaintiff's reported activities of daily living). (R.p. 41). Dr. Korn assessed Plaintiff's mental status as being "fairly normal", and found that while Plaintiff had weakness on her left upper extremity, her right upper extremity was unremarkable, that her station was fairly unremarkable and she did not require the use of any assistive device to ambulate, and that Plaintiff's lower extremities had a normal joint appearance and motion with no significant decrepitus. He further noted that Plaintiff had herself stated that she was capable of being up and weight bearing for about thirty to sixty minutes at a time, a restriction specifically incorporated into Plaintiff's RFC by the ALJ. (R.p. 30). Richardson v. Perales, 402 U.S. 389, 408 (1971) [assessments of examining, non-treating physicians may constitute substantial evidence in support of a finding of non-disability].

The ALJ also gave partial weight to Dr. Ruffing's findings, who concluded that Plaintiff's emotional functioning was unremarkable, that she demonstrated an appropriate affect of





normal range and intensity, that she was capable of caring for her personal needs and household chores including some light cooking and doing laundry, that she could utilize computers and could read texts such as newspaper articles, instruction manuals, or inventory lists, and that she had sufficient math skill that she could likely manage her finances. With respect to Dr. Ruffing's findings that Plaintiff did show a particular weakness on verbal concept formation, verbal reasoning, as well as relative weakness in her ability to quickly and correctly scan, sequence, or discriminate simple visual formation, the ALJ accounted for these limitations by restricting Plaintiff to jobs involving the application of common sense understanding and to carrying out detailed, but uninvolved, written or oral instructions with few concrete variables in or from standardized situations. (R.p. 30).

The reason the ALJ assigned only "partial weight" to Dr. Ruffing's opinion was because he found that Dr. Ruffing's finding that Plaintiff would likely struggle to maintain concentration, persistence and pace was inconsistent with Dr. Ruffing's own findings from his examination that Plaintiff was fully alert, her thought processes and thought content were normal, that she demonstrated normal cognitive processing speed, and had no distractability to attention. (R.pp. 41, 826). These are in fact all findings from Dr. Ruffing's examination, and the undersigned can therefore discern no reversible error in the ALJ's decision to discount that particular conclusion of Dr. Ruffing. Trenary, 898 F.2d at 1364 [Courts should properly focus not on a claimant's diagnosis, but on the claimant's actual functional limitations]. In any event, in consideration of Plaintiff's cognitive weaknesses, the ALJ included as a restriction in Plaintiff's RFC that she could only work in jobs that required simple routine tasks in a low stress work environment, which he





defined as one being free of fast-paced or team-dependant production requirements. These limitations reasonably accounted for the evidence from various sources relating to Plaintiff's diminished overall cognitive abilities. (R.p. 29). See Smith, 99 F.3d at 638 ["The duty to resolve conflicts in the evidence rests with the ALJ, not with a reviewing court"].

Additionally, the ALJ's discounting of Dr. Cantillion's opinion of unemployability is supported by the opinions of the state agency physicians. Dr. Hammond's psychological opinion was given great weight as being consistent with the longitudinal record, and was specifically adopted into the RFC filings, while Dr. Burge's opinion was given significant weight as to his postural and environmental limitations, which indicated she could do a wide range (but not the full range, see n. 6, supra) of light work with the limitations noted in the decision. (R.pp. 40, 42). See Johnson v. Barnhart, 434 F.3d 650, 657 (4th Cir. 2005)[ALJ can give significant weight to opinion of medical expert who has thoroughly reviewed the record]; Stanley v. Barnhart, 116 F. App'x 427, 429 (4th Cir. 2004)[disagreeing with argument that ALJ improperly gave more weight to RFC assessments of non-examining state agency physicians over those of examining physicians]; 20 C.F.R. §§ 404.1527(e); SSR 96-6p, 1996 WL 374180, at *1 (July 2, 1996) ["Findings of fact made by State agency ... [physicians ]... regarding the nature and severity of an individual's impairments must be treated as expert opinion of non-examining sources at the [ALJ] and Appeals Council level of administrative review."]; cf. Ponder v. Colvin, 770 F.3d 1190, 1195 (8th Cir. 2014) [noting that opinions from state agency consultants may be entitled to even greater weight than the opinions of treating or examining sources].





In sum, the ALJ properly considered and analyzed Dr. Cantillion's opinions in conjunction with her own records and the evidence as a whole, and the decision does not reflect a failure by the ALJ to properly consider her opinions or the record and evidence in this case. Krogmeier, 294 F.3d at 1023 ["[W]hen a treating physician's opinions are inconsistent or contrary to the medical evidence as a whole, they are entitled to less weight" (citations omitted) ].[8] While Plaintiff argues that there is some evidence in the record to support a finding that her impairments were more limiting than found by the ALJ in his decision, the job of the ALJ is to evaluate *all* of evidence, and then make a fact finding as to a claimant's RFC based on the *totality* of that evidence. See Hays, 907 F.2d at 1456 [It is the responsibility of the ALJ to weigh the evidence and resolve conflicts in that evidence]. That is exactly what the ALJ did here; he evaluated the evidence of record and determined that Plaintiff's impairments, although severe, did not prevent her from performing light work with limitations designed to specifically account for the effects of her medical impairments as shown and documented in the record. Carlson v. Shalala, 999 F.2d 180, 181 (7th Cir. 1993) ["...What we require is that the ALJ sufficiently articulate his assessment of the evidence to 'assure us that the ALJ considered the important evidence ... [and to enable] us to trace the path of the ALJ's reasoning.'"].

This Court cannot substitute its own judgment for that of the ALJ just because there may be conflicting evidence. See Johnson v. Barnhart, 434 F.3d 650, 653 (4th Cir. 2005) ["In reviewing for substantial evidence, we do not undertake to reweigh conflicting evidence."]; Mastro

[8]The fact that the ALJ (correctly) noted that some of Dr. Cantillion's hand-written notes are illegible does not provide a basis to reverse the decision, as argued by the Plaintiff, as only parts of her hand-written records are illegible. Other parts are readable, while additional records from Dr. Cantillion are typed, and it is clear the ALJ considered her opinions. (R.pp. 31-32, 36-37, 39-40).





v. Apfel, 270 F.3d 171, 176 (4th Cir. 2001)[holding that the court is not to "undertake to re-weigh conflicting evidence, make credibility determinations, or substitute [its] judgment for that of" the agency]; see also Guthrie v. Astrue, No. 10-858, 2011 WL 7583572, at * 3 (S.D.Ohio Nov. 15, 2011), adopted by, 2012 WL 9991555 (S.D.Ohio Mar. 22, 2012)[Even where substantial evidence may exist to support a contrary conclusion, "[s]o long as substantial evidence exists to support the Commissioner's decision . . . this Court must affirm."]. Therefore, Plaintiff's argument that the decision in this case should be reversed because the ALJ improperly evaluated Dr. Cantillion's opinion is without merit. Smith, 99 F.3d at 638 ["The duty to resolve conflicts in the evidence rests with the ALJ, not with a reviewing court"].

**Conclusion**

Substantial evidence is defined as " ... evidence which a reasoning mind would accept as sufficient to support a particular conclusion." Shively v. Heckler, 739 F.2d 987, 989 (4th Cir. 1984). As previously noted, if the record contains substantial evidence to support the decision (i.e., if there is sufficient evidence to justify a refusal to direct a verdict were the case before a jury), this Court is required to uphold the decision, even should the Court disagree with the decision. Blalock, 483 F.2d at 775.

Under this standard, the record contains substantial evidence to support the conclusion of the Commissioner that the Plaintiff was not disabled within the meaning of the Social Security Act during the relevant time period. Therefore, it is recommended that the decision of the Commissioner be **affirmed**.





The parties are referred to the notice page attached hereto.

Bristow Marchant
United States Magistrate Judge

October 25, 2016
Charleston, South Carolina





**Notice of Right to File Objections to Report and Recommendation**

The parties are advised that they may file specific written objections to this Report and Recommendation with the District Judge. Objections must specifically identify the portions of the Report and Recommendation to which objections are made and the basis for such objections. "[I]n the absence of a timely filed objection, a district court need not conduct a de novo review, but instead must 'only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation.'" *Diamond v. Colonial Life & Acc. Ins. Co.*, 416 F.3d 310 (4th Cir. 2005) (quoting Fed. R. Civ. P. 72 advisory committee's note).

Specific written objections must be filed within fourteen (14) days of the date of service of this Report and Recommendation. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b); *see* Fed. R. Civ. P. 6(a), (d). Filing by mail pursuant to Federal Rule of Civil Procedure 5 may be accomplished by mailing objections to:

Robin L. Blume, Clerk
United States District Court
Post Office Box 835
Charleston, South Carolina 29402

**Failure to timely file specific written objections to this Report and Recommendation will result in waiver of the right to appeal from a judgment of the District Court based upon such Recommendation.** 28 U.S.C. § 636(b)(1); *Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984).

